CHANCE BILLER,

               Plaintiff,

                                             Case No. 25-cv-0066-bhl

   v.

CITY OF NEW BERLIN,

               Defendant.

## ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

Chance Biller, a former City of New Berlin employee, alleges that the City violated his First Amendment rights and Wisconsin law by terminating his employment after he sent two emails to the mayor's office criticizing City policy. (ECF No. 13 ¶¶45–51.) He seeks declaratory relief under 28 U.S.C. §§2201 and 2202, along with damages and attorney's fees under 42 U.S.C. §§1983 and 1988. (*Id.* ¶¶15, 52.) The City has moved to dismiss Biller's amended complaint, arguing that Biller's emails are not protected speech and that Biller's employment was terminated for reasons unrelated to the content of his speech, namely his poor attendance, insubordination, and failure to follow expectations set by the employee handbook. (ECF Nos. 14, 15, & 16-1.) Because Biller's speech was not protected, the City could not have violated his First Amendment rights when it ended his employment. Accordingly, the Court will dismiss Biller's First Amendment claim and relinquish jurisdiction over his remaining state law cause of action.

## BACKGROUND[1]

Plaintiff Chance Biller is a Wisconsin resident, who began work as a City of New Berlin patrol worker on May 21, 2021. (ECF No. 13 ¶¶2, 19–20.) The City is a municipal corporation organized under Wisconsin law. (*Id.* ¶6.) During his employment with the City, Biller's first and second-level supervisors were Don Ullman and Steve Brooks. (*Id.* ¶¶11–12.) Josh Radomski was

---

[1] This Background is derived from Plaintiff's amended complaint, (ECF No. 13), the allegations in which are presumed true when considering a motion to dismiss, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554–56 (2007), and documents incorporated by reference in Biller's amended complaint, *see Williamson v. Curran*, 714 F.3d 432, 435–36 (7th Cir. 2013); *see also* Fed. R. Civ. P. 10(c).

the City's Director of Public Works and responsible for making final hiring and firing decisions within the department at the time of Biller's employment. (*Id*. ¶13.)

In October of 2021, Biller and other public works employees were sent to Sunnyslope Road without the "correct signage" to perform roadwork. (*Id.* ¶¶21–22.) They were "almost . . . killed by motorists" and left without completing the assigned work. (*Id.* ¶23.) After the City created new signs, Biller and his coworkers were ordered back to the worksite, but the newly created signs "were also incorrect" and they remained at risk. (*Id.* ¶¶24–25.) Biller's second-level supervisor, Brooks, told him the City had rejected a request for $2,800 in funds for proper signage. (*Id.* ¶26.)

Following this incident, on October 12, 2021, Biller sent an email from his personal email account to the office of the City's Mayor, David Ament. (*Id.* ¶¶27, 30.) Biller also attempted to send the email to the City's Director of Administration, David Bailey, but misspelled Bailey's email address. (*Id.* ¶27.) Biller provided a copy of the email to all three of his supervisors: Radomski, Brooks, and Ullman. (*Id.* ¶28.) In the email, Biller states that he is sending it "in hopes of getting some answers" both "as a [taxpayer] and City of New Berlin Streets Department employee." (*Id.* ¶27.) He also clarifies that he is communicating "on [his] own" and no one else knew he was sending the email. (*Id.*) Biller then raises two main areas of complaint, both arising from his work assignments. First, Biller protests against having been assigned to prepare Christmas wreaths. (*Id.*) He complains that the wreaths cost $500 each and raises concerns about the source of the funding for the wreaths. (*Id.*) He refers to a "slush fund" through which taxpayer revenue may have been improperly diverted and questions whether funding for the wreaths should have been subject to a taxpayer referendum. (*Id.*) He also implies that city employees have stopped asking questions about the source of the City's funds. (*Id.*) He then indicates an intent to "formally request an official total on the overall cost" of another City project related to the New Berlin Historical Society Building. (*Id.*) Biller's second area of complaint concerns his work assignment on Sunnyslope Road. He states that the Sunnyslope Road work was delayed because workers did not have proper signs for the project and that he refused to work on the road without proper signs. (*Id.*) He indicates that his supervisors agreed with him and that, while he tried to find the correct signs, he was told that the crew would need to use makeshift signs because "the safety funds request for these very signs were [sic] denied." (*Id.*) He next states that the public works department was forced to run on a small budget, while "millions" are "pumped" into a New

Berlin Historical Society Building, which he complains "truly serves no purpose," and thousands of dollars are spent on Christmas wreaths. (*Id.*) He remarks that it is difficult to provide quality services to the taxpayers, and lists several public works probjects he sees as more practical and worthy of funds. (*Id.*) In closing, he adds, "[i]f at any time my work environment changes because of this email, you will be dealing with a slew of attorneys, no threat." (*Id.*)

In response to the email, Biller received a reprimand from Radomski, who told Biller that he should not have sent it. (*Id.* ¶¶29, 34.) According to a memo documenting the reprimand, Radomski learned that Biller had informed other staff members that he was planning to send the email before he did so. (*Id.* ¶34.) The memo indicates Radomski's concern that Biller went outside the chain of command and explains that requests for information should go through the City Clerk's office. (*Id.*) The memo also indicates that the reprimand is unrelated to the contents of the letter and is based on the fact that Biller did not "follow the appropriate chains of command" to address his concern. (*Id.*)

On December 3, 2021, Biller sent a second email complaining about issues related to his job. (*Id.* ¶37.) This email was addressed only to Bailey, but Biller again misspelled Bailey's email address. (*Id.*)[2] In the email, Biller complains that Brooks had attended work while ill on November 29 and 30, 2021, and then tested positive for COVID-19. (*Id.*) The email notes that workers who had been in close contact with Brooks were sent home and told they would need to provide a negative test to return to work on December 8, 2021. (*Id.*) Biller expresses frustration with the policy, because it would not compensate him for days he had to stay home, and he perceives the policy as being ignored by supervisors but followed by lower-level workers. (*Id.*) He asks for information on the COVID-19 absence procedures for salaried workers and whether they also lost pay if sent home because a coworker "did not follow the proper procedures[.]" (*Id.*) He notes in closing "[i]f need be, I will take this a lot further to include legal and the court of public opinion (media)." (*Id.*)

On January 13, 2022, Radomski terminated Biller's employment. (*Id.* ¶39.) At a termination meeting and in a "termination letter," Radomski referenced Biller's October 12, 2021 email. (*Id.* ¶¶40–41.) The amended complaint does not indicate whether the December 3, 2021 email was referenced.

---

[2] Biller copied two others on the email (jameslewis33@yahoo.com and jtfabian50@gmail.com), but the parties have not identified these additional recipients. (*Id.*)

The City asserts, and Biller's briefing confirms, that the "termination letter" referenced in the amended complaint is a dismissal form and accompanying memo that were provided to Biller. (ECF No. 15 at 7; ECF No. 17 at 7; ECF No. 16 ¶3.) According to the dismissal form, Biller was dismissed for his attendance, insubordination, and "failure to follow Expectations and City Handbook." (ECF No. 16-1 at 1.) The accompanying termination memorandum provides more detail, indicating that Biller was "terminated on [sic] due to an accumulation of violations, insubordinate and unprofessional behavior." (*Id*. at 3.) The memorandum also describes a number of problematic incidents including: Biller's behavior while receiving a verbal warning on October 14, 2021; Biller's behavior on December 2, 2021, in relation to his complaint about potential COVID-19 exposure; continued workplace conflicts related to the City's COVID-19 policy throughout December; an additional December 21, 2021 email to the mayor's office that Biller does not address in his complaint; Biller's absence when called in for late night snow-plowing and conflicts with his supervisors about those absences; Biller's attempts to bring other employees into a meeting with human resources; calling out from work "due to his inability to fall asleep;" and criticizing management for the way it notified employees they needed to work during winter storms. (*Id.* at 3–5.) The memorandum states that:

> management have been informed by other team members about the work environment created by Chance [sic] behaviors. Chance's behavior has created an environment which teamwork and cohesiveness has been impacted directly. Having an individual creating disharmony and disruption within the Public Works department is unacceptable and must be addressed immediately to reduce to [sic] impact on the workforce as a whole.

(*Id.* at 5.) It also attaches additional emails in which Biller expresses his frustration with the City's COVID-19 attendance policy, and its impact on his wages and time off. (*Id.* at 8–11.) Biller threatens litigation in several of these emails. (*Id.* at 8, 10–11.)

## LEGAL STANDARD

When deciding a Rule 12(b)(6) motion to dismiss, the Court must "accept all well-pleaded facts as true and draw reasonable inferences in the plaintiff['s] favor." *Roberts v. City of Chicago*, 817 F.3d 561, 564 (7th Cir. 2016) (citing *Lavalais v. Village of Melrose Park*, 734 F.3d 629, 632 (7th Cir. 2013)). A complaint must contain a "short and plain statement of the claim showing that [the plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, a complaint "must do more than recite the elements of a cause of action in a conclusory fashion." *Roberts*, 817 F.3d at 565

(citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A complaint survives a 12(b)(6) motion when the facts pled "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citation omitted). The complaint will be dismissed if it fails to allege sufficient facts to state a claim on which relief may be granted. *See Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1027 (7th Cir. 2013).

Under Federal Rule of Civil Procedure 10(c), written instruments attached to a pleading become part of the pleading. *Williamson,* 714 F.3d at 435–36. The Seventh Circuit allows courts to consider "documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." *Id.* at 436 (citing *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012)).

## ANALYSIS

Biller's First Amendment claim is governed by *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). To prevail, Biller must allege that he suffered a constitutional violation and that the City authorized or maintained a custom of approving the unconstitutional conduct. *See id.* at 694–95; *Petty v. City of Chicago*, 754 F.3d 416, 424 (7th Cir. 2014) (citing *Thompson v. Boggs*, 33 F.3d 847, 859 (7th Cir. 1994)). Because Biller has not alleged facts sufficient to state a claim for an underlying First Amendment violation, his *Monell* claim must be dismissed.

To state a claim for First Amendment retaliation, a plaintiff must allege that (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was "at least a motivating factor" in the state actor's decision to take retaliatory action. *See Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008). As a city employee, Biller's right to criticize the City is balanced against the City's need, as his employer, to manage its operations and employees. Accordingly, not all public employee speech is protected by the First Amendment. The Supreme Court has explained that a citizen who enters government service necessarily accepts limitations on his freedom to criticize his employer. *Garcetti v. Ceballos*, 547 U.S. 410, 418–19 (2006).

Whether a public employee's speech is protected is a question of law that can be resolved at the pleading stage. *See McArdle v. Peoria School Dist. No. 150*, 705 F.3d 751, 754 (7th Cir. 2013) ("The inquiry into the protected status of speech is one of law, not fact."); *Kubiak v. City of Chicago,* 810 F.3d 476, 481–82 (7th Cir. 2016) (affirming dismissal of police officer's internal report of coworker's verbal abuse as being made pursuant to official duties, and therefore unprotected by the First Amendment); *Fehlman v. Mankowski,* 74 F.4th 872 (7th Cir. 2023) (affirming dismissal of police officer's retaliation claims based on criticism of police chief's lack of professionalism and policy choices at public meeting).

In *Pickering v. Bd. of Educ. of Township High Sch. Dist. 205*, 391 U.S. 563, 568–69 (1968), and *Connick v. Myers*, 461 U.S. 138, 143 & 149 (1983), the Supreme Court made clear that a public employee's speech is protected by the First Amendment only when the employee speaks as a private citizen and on a matter of public concern. If the plaintiff public employee was not speaking as a private citizen, it does not matter if the speech addressed a matter of public concern. *Garcetti*, 547 U.S. at 421–22; *Davis v. Cook Cnty.*, 534 F.3d 650, 653–54 (7th Cir. 2008); *Bivens v. Trent*, 591 F.3d 555, 560 (7th Cir. 2010). If the employee clears that bar, courts then proceed to "balance the interests of the employee, as a citizen, in commenting on the issue of public concern against the interests of the government, as an employer, in the proper performance of its public functions." *Darlingh v. Maddaleni*, 142 F.4th 558, 565 (7th Cir. 2025) (citing *Pickering*, 391 U.S. at 568; *Connick*, 461 U.S. at 142).

The Supreme Court refined the analysis for determining whether a public employee speaks as a private citizen in *Garcetti*. In *Garcetti*, a deputy district attorney sent a memorandum to his supervisors recommending dismissal of a criminal case based on inconsistencies in an affidavit the government had used to obtain a search warrant. 547 U.S. at 413–14. His supervisors rejected his recommendation and then allegedly retaliated against him by reassigning him to a different position at a different courthouse and denying him a promotion. *Id*. at 414–15. In response, he sued them, alleging claims for improper retaliation in violation of his First and Fourteenth Amendment rights. *Id.* at 415. The district court granted summary judgment to the government, but the Ninth Circuit reversed, holding the employee's speech was protected under the First Amendment analysis in *Pickering* and *Connick*. *Id.* at 415–16. After granting cert, the Supreme Court reversed the Ninth Circuit, holding that the deputy district attorney was not speaking as a private citizen in the memo. *Id.* at 417, 421. In making this determination, the Court explained

that the "controlling factor" was that the plaintiff's expressions were made "pursuant to his duties" and that "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Id.* at 411, 421. The Court thus held that when a public employee speaks pursuant to professional or official duties, his or her speech is unprotected. *Id.* at 421.

The Seventh Circuit has also elaborated on the circumstances in which a public employee's speech qualifies for First Amendment protection. The Court of Appeals has emphasized that in analyzing whether a public employee is speaking pursuant to his official duties, courts must construe the employee's "official duties" broadly and practically, with attention to what the employee actually does, not just job descriptions or guidelines. *Morales v. Jones*, 494 F.3d 590, 595–97 (7th Cir. 2007); *Sweet v. Town of Bargersville*, 18 F.4th 273, 278–79 (7th Cir. 2021). The Court has also confirmed that statements an employee would be expected to make—like internal reports of wrongdoing or breaches of policy by coworkers—constitute unprotected speech, made "pursuant to their official duties" within the meaning of *Garcetti*. *Kubiak*, 810 F.3d at 481–82 (affirming dismissal of claim by police officer reporting verbal assault by fellow officer); *Spiegla v. Hull*, 481 F.3d 961, 966–67 (7th Cir. 2007) (vacating the jury verdict based on corrections officer's report of protocol breach by other officers).

Even speech that falls outside an employee's typical duties, and that an employer does not expect or request, can be made pursuant to official duties. In *Davis*, the Seventh Circuit affirmed a district court's holding that a nurse was speaking pursuant to her official duties when she sent a memorandum describing negative interactions among hospital staff to her hospital's "Employee Assistance Counselor" and copied several hospital officials. 534 F.3d at 652–54. The Court of Appeals noted that the memorandum concerned her work as a nurse and described how the interactions harmed patient care, concerns that a conscientious nurse would be expected to raise. *Id*. at 653. It did not matter that the document was not requested or that drafting letters of complaint was not one of the typical functions of her job. *Id*. The close connection between the content of the complaints and the nurse's duties meant she spoke pursuant to her official duties, and not as a private citizen. *Id.* at 653–54.

Biller's retaliation claims are based on statements he made in his October 12 and December 3, 2021 emails. (ECF No. 13 ¶¶37, 40–41.) Because the content of both emails and the context in

which Biller sent them confirms that neither qualifies as protected speech, Biller's claims fail as a matter of law.

With respect to the October 12, 2021 email, Biller affirmatively states in the text of his correspondence that he was speaking both as a taxpayer and as a "*City of New Berlin Streets Department employee*." (ECF No. 13 ¶27) (emphasis added). Given this acknowledgment, Biller can hardly deny that he was speaking as a public employee. Moreover, the content of his message confirms that he was speaking pursuant to his role as a City employee. He describes project delays and safety concerns that he experienced on the job as a patrol worker to criticize the city's budget choices. (*Id.* ("Now for the part of a City of New Berlin Streets employee. I was sent out with a work crew . . . ") He asks about the source of funds for the wreaths because he had to prepare them. (*Id.*) He requests cost information for the Historical Society renovation because he believes the City's Streets department is forced to run on a small budget because of that project's ballooning costs. (*Id.*) These complaints are all linked to his role as a public employee, and how he believes the City's spending choices make his job harder and less useful to the public. The email itself exists only because of Biller's workplace duties and, more specifically, his frustration about the City's spending choices impact on those duties. The statements in the October 12 email are like the nurse's complaints in *Davis* about discord and conflict between hospital staff members. *See* 534 F.3d at 652–54. Like the speech in *Davis*, Biller's email did not convey information requested or expected by his employer, but the contents arose from Biller's attempt to redress a problem in his workplace. *See id.* Also like the nurse in *Davis*, Biller sent his email to an internal audience, the mayor and director of administration, and provided copies to his more immediate supervisors: Radomski, Brooks, and Ullman. *See id.* at 652; (*see also* ECF No. 13 ¶28). Because the speech in Biller's October 12 email was made pursuant to his public employment, it was not protected by the First Amendment.

Biller's December 3, 2021 email is also not protected speech. Like the prior email, the content and audience of this communication show Biller was not speaking as a private citizen when he sent it. Biller describes how he was sent home after his supervisor tested positive for COVID-19 and was then told he would have to miss multiple days of work and provide a negative test to return. (ECF No. 13 ¶37.) He also complains that the City's decision not to pay him, or other workers, for this missed time was "unethical and inappropriate[.]" (*Id.*) These statements relate directly to the City's policy on managing COVID-19 related absences and exist only because

Biller disapproved of that policy because it caused him to lose wages and time off. Similarly, Biller's complaint that other employees ignore the policy constitutes speech made pursuant to his official duties because it raised concerns about the alleged misconduct of other employees. The Seventh Circuit has repeatedly held that internal complaints of coworkers' or supervisors' misconduct are made as public employees, not private citizens. *See Kubiak*, 810 F.3d at 481–82; *Spiegla*, 481 F.3d at 961–67; *Houskins v. Sheahan*, 549 F.3d 480, 491 (7th Cir. 2008) (concluding that plaintiff social worker's internal complaint reporting coworker's assault was made pursuant to official duties, while police report of the same conduct was made as a private citizen); *Sweet*, 18 F.4th at 276–79 (holding town clerk-treasurer's department employee, who disconnected utilities as part of her job duties, was speaking pursuant to her official duties when she criticized the town clerk-treasurer for reconnecting an influential resident's utilities despite his delinquent balance). To reiterate, Biller's complaints were directed internally to the City's Director of Administration. *See Davis*, 534 F.3d at 652–54; (*see also* ECF No. 13 ¶37).

Biller argues both of his emails are protected because sending them was not part of his job as a patrol worker. (ECF No. 17 at 4.) The Seventh Circuit has rejected this approach. In *Davis*, the plaintiff argued that her position as a nurse did not include sending unsolicited complaints. But the Court of Appeals held that her position should not be construed so narrowly, and because her memorandum described how other employees' conduct harmed patient care, and her ability to do her job, it was made pursuant to her official duties. *Davis*, 534 F.3d at 652–54.

Because Biller has not shown that he was speaking as a private citizen when he sent either email, the Court need not assess whether he was speaking on a matter of public concern while sending them or balance the City's interest in promoting effective and efficient public service against Biller's interests in commenting on the subjects he raises. *See Davis*, 534 F.3d at 653–54. Nevertheless, the Court acknowledges that Biller's October 12, 2021 email may address a matter of public concern given that the October 12, 2021 email criticizes government inefficiency and spending choices; topics that are generally of interest and value to the public. *See Wainscott v. Henry*, 315 F.3d 844, 849 (7th Cir. 2003)*; Meade v. Moraine Valley Cmty. Coll.*, 770 F.3d 680, 684–85 (7th Cir. 2014).

Even if Biller's speech implicated the First Amendment, his claim would fail at the balancing step. A government employer may restrict protected employee speech if the government employer's interest in promoting effective and efficient public service outweighs the employee's

interest as a citizen in commenting on the matter. *Connick*, 461 U.S. at 150–51; *Garcetti*, 547 U.S. at 418 (citing *Pickering*, 391 U.S. at 568). This balancing test is a question of law that may be resolved at the motion to dismiss phase. *Craig v. Rich Tp. High Sch. Dist.* 227, 736 F.3d. 1110, 1118 (7th Cir. 2013). In evaluating the government's interests under this rubric, courts "focus[] on the effective functioning of the public employer's enterprise. Interference with work, personnel relationships, or the speaker's job performance can detract from the public employer's function; avoiding such interference can be a strong state interest." *Id.* at 1119 (alteration in original) (quoting *Rankin v. McPherson*, 483 U.S. 378, 388 (1987)). While the Seventh Circuit uses a seven-factor non-exclusive list as guidance to conduct this balancing test, courts need not consider each factor and should instead focus on the most important factors in each case. *Darlingh*, 142 F.4th at 565–66.

Even if Biller's speech *was* made as a private citizen on a matter of public concern, the City's interest in managing its public works department would still outweigh Biller's interest on commenting internally on the city's spending decisions and COVID-19 policy. Biller's speech risked disrupting the City's Public Works Department and appears to have actually disrupted that department. *See Connick*, 461 U.S. at 151–52 ("[W]e do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office . . . is manifest before taking action."). This is confirmed in Biller's termination memo, which indicates that other employees complained about Biller disrupting their workplace, (ECF No. 16-1 at 5), and in his written reprimand, which notes that Biller had shared his plan to send the October 12, 2021 email with other staff members before sending it, (ECF No. 13 ¶34). Moreover, Biller's own words include express threats to disrupt his department and the City through litigation and unwanted media coverage. (*Id.* ¶¶27, 37.) In addition, the underlying disputes arose at work, in the context of workplace frustrations and the Supreme Court has explained that public employers, like the City, do not have to run their operations as a "roundtable for employee complaints." *Connick*, 461 U.S. at 149. Biller's speech could, and seemingly did, create problems in maintaining discipline or harmony among his co-workers.

Because Biller has not alleged facts showing a constitutional violation, Biller's *Monell* claim fails as a matter of law. *See Petty*, 754 F.3d at 424 (citing *Thompson*, 33 F.3d at 859). The Court will also dismiss his state law claim over which the Court only had supplemental jurisdiction. *See* 28 U.S.C. §1367(c)(3); *see also Davis*, 534 F.3d at 654.

**CONCLUSION**

The City's decision to end Biller's employment did not violate the First Amendment, because Biller's speech was made as a public employee. Biller therefore fails to state a First Amendment Retaliation claim.

For the reasons discussed above,

**IT IS HEREBY ORDERED** that Defendant's Motion to Dismiss Plaintiff's Amended Complaint, ECF No. 14, is **GRANTED** with respect to Biller's federal claim. The Court relinquishes its jurisdiction over Biller's remaining claim, and the case is **DISMISSED**. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin on March 23, 2026.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge